UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X

CYNTHIA SAUNDERS, et al.,

             Plaintiffs,

    - against -

CITY OF NEW YORK and THE NEW
YORK CITY DEPARTMENT OF
EDUCATION,

             Defendants.

------------------------------------------------------X

**OPINION AND ORDER**

**07 Civ. 830 (SAS)**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 12/9/09

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I. INTRODUCTION

Plaintiffs, approximately 194 current and former municipal

employees, filed a collective action against the City of New York ("City") and the

New York City Department of Education ("DOE"), pursuant to the Fair Labor

Standards Act ("FLSA").[1]  In that action, plaintiffs alleged that: (1) defendants

failed to compensate plaintiffs for hours worked between thirty-five and forty and

over forty in a workweek (the "failure to pay claims"); (2) defendants failed to

compensate plaintiffs for hours worked over forty in a workweek at the rate of one

---

[1]      *See* 29 U.S.C. §§ 201-219.

and one-half times their regular rate of pay (the "overtime claim"); (3) defendants compensated plaintiffs for hours worked over forty in a workweek with compensatory time instead of statutorily required cash (the "failure to pay cash claim"); (4) defendants wrongfully converted plaintiffs compensatory time into sick leave after ninety days or otherwise prevented plaintiffs from using their compensatory time (the "conversion claim/denial of use claim").[2]

Plaintiffs now seek an award of attorneys' fees and costs, as provided for in the Settlement Agreement and mandated by statute.[3]  In particular, with regard to Lewis Brisbois Bisgaard & Smith LLP ("Lewis Brisbois" or "LBB&S"), plaintiffs seek attorneys' fees in the amount of $2,221,065.00, and costs in the amount of $25,311.76, for a total award of $2,246,376.76.  With regard to the Office of General Counsel ("OGC") for District Council 37, AFSCME, AFL-CIO ("DC 37"), plaintiffs request $50,262.66 in attorneys' fees, plus $112,269.72 in costs, for a total award of $162,532.38.  For the following reasons, plaintiffs'

---

[2]    *See Saunders v. City of New York*, 594 F. Supp. 2d 346, 350 (S.D.N.Y. 2008).

[3]    Section 216(b) of the FLSA provides, that upon a finding of liability under sections 206 or 207, "[t]he court . . . shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorneys' fee to be paid by the defendant, and the costs of the action."  29 U.S.C. § 216(b).

2

applications are granted, but not in the amounts requested.[4]

## II. BACKGROUND

### A. Prior Proceedings

Named plaintiff Cynthia Saunders works as a Parent Coordinator

("PC") in the New York City school system.[5] DC 37 is the recognized collective

bargaining representative for individuals previously employed as PCs and Parent

---

[4] In determining the appropriate amount of attorneys' fees and costs, I thoroughly reviewed the following: Plaintiff's Memorandum of Law in Support of Plaintiffs' Application for Attorneys' Fees and Costs ("Pl. Mem."); the Declaration of Ivan D. Smith in Support of Plaintiffs' Application for Attorneys' Fees and Costs ("Smith Decl."); Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Attorneys' Fees and Costs ("Def. Mem."); the Declaration of Diana Goell Voigt in Opposition to Plaintiffs' Motion for Attorneys' Fees and Costs ("Voigt Decl."); Plaintiffs' Reply Memorandum of Law in Support of Plaintiffs' Application for Attorneys' Fees and Costs ("Reply Mem."); and the Supplemental Declaration of Ivan D. Smith in Support of Plaintiffs' Application for Attorneys' Fees and Costs ("Smith Supp. Decl."). I have reviewed the invoices for work performed by plaintiffs' expert Louis Lanier, Ph.D of EconOne, which, because they were not included in plaintiffs' moving papers, were subsequently requested by Chambers in a voice-mail message to Sabrina Tann and sent to this Court under separate cover dated November 19, 2009. I have also reviewed defendants' opposition letter, dated November 24, 2009, regarding the belatedly submitted invoices, as well as plaintiffs' reply letter thereto, dated December 4, 2009. Although I do not explicitly address each of the parties' arguments regarding the instant fee request, I have considered all of them and conclude that the amounts determined below represent reasonable fees, and compensable costs, for the efforts expended by counsel in this relatively straightforward FLSA action.

[5] See Smith Decl. ¶ 4.

Support Officers ("PSOs").[6] The OGC provides legal services to DC 37 and its members. On July 18, 2008, Saunders met with Leonard D. Polletta, former assistant general counsel in the OGC, to discuss a salary dispute with the DOE.[7] During their meeting, Saunders informed Polletta that the DOE had a widespread practice of paying for overtime hours in compensatory time instead of cash.[8] From August to November 2006, Polletta tried to settle Saunders' claim but was ultimately unsuccessful.[9] On February 2, 2007, the OGC filed a collective action under the FLSA, on behalf of the named plaintiffs and all others similarly situated.[10] Among other tasks, Polletta drafted and filed the Complaint, processed and filed approximately 210 consent opt-in forms, attended the initial court conference on May 30, 2007, and conducted the initial phase of discovery.[11] In July 2007, Polletta left the OGC and, shortly thereafter, plaintiffs retained Lewis

---

[6]  PCs and PSOs are now known as District Family Advocates. *See id.* ¶ 2.

[7]  *See id.* ¶ 5.

[8]  *See id.*

[9]  *See id.* ¶ 6.

[10]  *See id.* ¶ 7.

[11]  *See id.* ¶¶ 9-10.

4

Brisbois in September 2007.[12]

Discovery commenced on May 30, 2007, and closed approximately one year later, on May 30, 2008.[13] During the course of discovery, Lewis Brisbois prepared initial disclosures and drafted and responded to interrogatories and document demands.[14] Lewis Brisbois produced approximately 4,000 Bates-numbered pages of documents to defendants and reviewed approximately 11,456 Bates-numbered pages of documents received from defendants, as well as several discs containing thousands of pages of electronic data.[15] Lewis Brisbois prepared for and defended the depositions of eight plaintiffs and deposed seven defense witnesses.[16]

At the conclusion of fact discovery, the parties cross- moved for summary judgment. A pre-motion conference was held on May 27, 2008. At the pre-motion conference, defendants asserted, for the first time, that they lawfully paid plaintiffs for overtime hours in compensatory time instead of cash pursuant to

---

[12]    *See id.* ¶¶ 11-12. Attorneys Ivan D. Smith and Maureen Stampp of Lewis Brisbois filed Notices of Appearance on September 13, 2007. *See id.* ¶ 13.

[13]    *See id.* ¶ 14.

[14]    *See id.* ¶ 15.

[15]    *See id.*

[16]    *See id.* ¶ 17.

individual agreements plaintiffs had entered into with their respective school principals.[17] This newly asserted defense necessitated the taking of additional discovery by the parties. Defendants were directed by the Court to provide plaintiffs with affidavits from the school principals who purportedly executed these alleged individual agreements.[18] Because defendants never identified any specific school principals or provided any affidavits, Lewis Brisbois decided to survey the plaintiff class broadly to ascertain whether any plaintiff had entered into an individual agreement to be paid in compensatory time in lieu of cash.[19] In connection with this time-consuming effort, Lewis Brisbois prepared affidavits for twenty-four plaintiffs.[20] Furthermore, because the individual agreement defense presented an issue of first impression, Lewis Brisbois "conducted extensive legal research in anticipation of opposing defendants' individual agreement defense."[21]

---

[17]    *See id.* ¶¶ 21-22.

[18]    *See id.* ¶ 23.

[19]    *See id.* ¶¶ 24-27.

[20]    *See id.* ¶ 26.

[21]    *Id.* ¶ 28. Whether "extensive" legal research was required is an open question. This Court noted that neither the Supreme Court nor the Second Circuit addressed the issue of "whether an employee who is a member of a collective bargaining unit may independently agree to receive compensatory time instead of cash when the [collective bargaining agreement] is silent concerning overtime compensation." *Saunders*, 594 F. Supp. 2d at 360. Albeit an issue of first

Defendants did not produce any affidavits from school principals in their summary judgment papers.[22]   Instead, defendants asserted, again for the first time, that they lawfully paid plaintiffs in compensatory time instead of cash pursuant to an implied agreement with plaintiffs' union, DC 37.[23]   This newly asserted defense resulted in Lewis Brisbois interviewing DC 37 personnel and reviewing the bargaining history between the parties and DC 37 to ascertain the existence and validity of any implied agreement.[24]   According to Lewis Brisbois, this "implied agreement defense" also required plaintiffs to conduct "extensive and thorough legal research."[25]

---

impression, it was an issue "easily resolved by looking to the text of the FLSA[.]" *Id.* After a brief analysis, this Court concluded that the FLSA permitted individual agreements accepting compensatory time for overtime instead of cash "only when employees do not have a bargaining agent." *Id.* at 361.  Because plaintiffs were represented by a union, DC 37, this Court rejected defendants' proposed individual agreement defense. *See id.*

[22]     Smith Decl. ¶ 30.

[23]     *See id.*

[24]     *See id.* ¶ 31.

[25]     *Id.*

Once the  summary judgment motions were decided,[26] the parties

began to prepare for trial.[27]  A final pre-trial conference was held on March 25,

2009.[28]  Lewis Brisbois drafted a trial memorandum as well as  plaintiffs' version

of the Joint Pretrial Order ("JPTO"), which included a witness list, an exhibit list,

a proposed jury charge, proposed voir dire questions, and a proposed verdict sheet

containing special interrogatories.[29]  Lewis Brisbois also filed motions *in limine* in

anticipation of trial.[30]  Although Lewis Brisbois sent defendants its draft version of

the JPTO on March 31, 2009, the parties did not submit a final JPTO to the Court

because they settled the case before the deadline for submission of the JPTO.

## B.     Summary Judgment

Both plaintiffs and defendants were partially victorious through

motion practice.  Plaintiffs moved, and defendants cross-moved, for partial

summary judgment on the following grounds:

> Plaintiffs request[ed] partial summary judgment on the
> overtime claim on three separate grounds: (1) defendants

---

[26]     *See infra* Part I.B.

[27]     *See* Smith Decl. ¶ 38.

[28]     *See id.* ¶ 40.

[29]     *See id.* ¶¶ 41-42.

[30]     *See id.* ¶ 41.

failed to pay overtime in cash; (2) defendants failed to provide payment for all hours worked over forty in a workweek; and (3) defendants paid at straight time instead of time-and-one-half for hours worked over forty in a workweek. Finally, plaintiffs [sought] equitable tolling of the statute of limitations as a matter of law on two separate grounds: (1) defendants failed to post the required Department of Labor FLSA notices; and (2) defendants willfully violated the FLSA.

Defendants also [sought] partial summary judgment on the following grounds: 1) the payment of compensatory time as overtime compensation did not violate the FLSA; 2) defendants permitted use of accrued compensatory time in accordance with statutory requirements; and 3) there is no evidence of an "actual practice" to pay plaintiffs at straight time instead of time and one half for hours worked over forty in a workweek.[31]

Although defendants' cross-motion was denied in its entirety,[32] I granted summary

judgment *sua sponte* in defendants' favor and dismissed plaintiffs' failure to pay

---

[31]     *Saunders*, 594 F. Supp. 2d at 350.

[32]     Plaintiffs voluntarily withdrew their conversion claim on July 14, 2008. *See* Smith Decl. ¶ 34 n.2 ("Previously, on July 14, 2008, plaintiffs withdrew the claim that defendants converted their compensatory time into sick days after 90 days."). After further briefing from the parties, I granted defendants' motion to dismiss the remaining denial of use claim. Ruling from the bench on March 25, 2009, I found that plaintiffs' denial of use claim had been rendered moot given my earlier ruling that defendants violated the FLSA when they compensated plaintiffs for overtime hours with compensatory time instead of cash. *See* Transcript for 3/25/09 Court Conference at 6.

claims.[33] Plaintiffs' motion was granted in part and denied in part. Plaintiffs

prevailed on their failure to pay cash claim by establishing defendants' liability as

a matter of law.[34] This Court made two important rulings regarding the use of

compensatory time as overtime compensation: (1) there was "no factual dispute

that plaintiffs received compensatory time for hours worked over forty in a

workweek;"[35] and (2) "defendants violated the FLSA by providing employees with

compensatory time for hours worked over forty in a workweek without an oral or

written agreement with their Union."[36]

        Both parties moved for summary judgment as to whether or not

defendants impermissibly paid straight time compensation for overtime hours (the

overtime claim).[37] Having found that plaintiffs failed to demonstrate that

inadequate compensation harmed the plaintiff class as a whole, "plaintiffs' partial

---

[33]     *See Saunders*, 599 F. Supp. 2d at 362-63 (holding that because
"plaintiffs have not offered proof that defendants maintain a policy or practice of
failing to compensate plaintiffs for overtime[,] . . . the Court grants summary
judgment in favor of defendants on the failure to pay claim.") .

[34]     A jury would have determined the *amount of damages* related to this
claim if the case had been tried.

[35]     *Id.* at 359.

[36]     *Id.* at 361.

[37]     *See id.*

10

summary judgment motion on the issue of liability as to those plaintiffs who were paid at straight time when they worked over forty hours a week [was] denied."[38] Defendants' motion for partial summary judgment with regard to the straight time issue was also denied. Because defendants did not meet their burden of establishing beyond dispute that there was no policy or practice of insufficiently compensating plaintiffs for overtime, the existence of whether defendants had a practice of underpayment was reserved for trial.[39]   Finally, plaintiffs' motion for equitable tolling of the statute of limitations was denied[40] as was their motion for application of a three-year statute of limitations due to defendants' alleged willful violation of the FLSA.[41]

## C.   The Settlement Agreement

In April 2009, the parties reached a proposed settlement of the FLSA collective action.[42]   The terms of the settlement were memorialized in a letter

---

[38]     *Id.* at 362.

[39]     *See id.*

[40]     *See id.* at 364 ("equitable tolling cannot be granted as a matter of law").

[41]     *See id.* ("There is insufficient uncontested evidence in the record to permit this Court to find, as a matter of law, that defendants acted willfully.").

[42]     *See* Smith Decl. ¶ 49.

11

drafted by defendants' counsel on April 9, 2009, and signed by both parties.[43] The

parties agreed that plaintiffs were entitled to attorneys' fees as though they were

prevailing parties on any claims that were not dismissed by this Court or

voluntarily withdrawn by plaintiffs.[44] The parties further agreed that plaintiffs

would submit an application to the Court seeking reasonable attorneys' fees and

costs in accordance with section 216(b) of the FLSA.[45] The total value of the

settlement was approximately \$1,088,000.00.[46] On June 19, 2009, the parties

executed a final Settlement Agreement which formalized, in greater detail, the

terms contained in the Letter Agreement.[47] Later that day, this Court approved of

and adopted the Settlement Agreement, except for a provision relating to

---

[43]    *See* Voigt Decl. ¶ 5 and Ex. 1 to the Voigt Decl. (the "Letter Agreement") ¶ 4.

[44]    *See* Letter Agreement ¶ 4.

[45]    *See id.*

[46]    *See* Letter Agreement at 3 ("In total, plaintiffs would receive \$650,000 in cash for economic damages and liquidated damages, 6813 hours in community time valued at approximately \$157,000 and will be permitted to keep the compensatory time in their banks, valued at approximately \$281,000 as of February 28, 2009.").

[47]    *See* Voigt Decl. ¶ 7. *See also* Settlement Agreement, Ex. D to the Smith Decl., ¶ 2.1.

12

plaintiffs' failure to pay claim.[48]  Since then, Lewis Brisbois has administered the

settlement funds, corresponded with plaintiffs about the terms of the settlement,

and prepared the instant fee request.[49]

### D.    Qualifications of Counsel

#### 1.    Lewis Brisbois

Lewis Brisbois is a national law firm with over seven hundred

attorneys in offices in New York, Chicago, Los Angeles, San Francisco and

fourteen other cities across the United States.[50]  Lewis Brisbois' "Employment

Practice Group," comprised of approximately sixty attorneys nationwide, provides

a full range of employment-related litigation services and counsel to a wide variety

of clients.[51]  Ivan D. Smith joined Lewis Brisbois in August 2007 as a partner and

---

[48]      *See* 6/19/09 Order of Dismissal With Prejudice ¶ 1 ("The Court
approves and adopts as stated the terms of the Settlement Agreement entered into
between and among the parties to this litigation, as it reflects a fair, reasonable,
and appropriate compromise demed in the best interest of the parties thereto, and
in accordance with law with respect to the claims asserted in this collective action,
except for as provided in paragraph 2.5 of the Settlement Agreement[.]").

[49]      *See* Smith Decl. ¶ 54.

[50]      *See id.* ¶ 55.

[51]      *See id.* ¶ 56 (clients range from Fortune 100 companies to individual
proprietors).

Vice Chair of the Labor and Employment Department.[52]  Before then, Smith was a

senior managing partner at Vladeck, Waldman, Elia & Engelhard, P.C.

("Vladeck"), where he worked for eighteen years specializing in labor,

employment and entertainment law.[53]  Smith has extensive experience representing

plaintiffs in employment discrimination cases, labor matters, and class actions.[54]

Maureen Stampp joined Lewis Brisbois as a partner in September 2007.[55]  Prior to

joining Lewis Brisbois, Stampp was a member of Vladeck where she specialized

in labor and employment law and ERISA litigation for over sixteen years.[56]

Sabrina Tann graduated from New York University School of Law in 2001 and

joined Lewis Brisbois as an associate in April 2008.[57]  From August 2004 through

April 2008, Tann worked as an Assistant Corporation Counsel in the Special

Federal Litigation Division of the New York City Law Department where she

---

[52]   *See id.* ¶ 62.

[53]   *See id.*

[54]   *See id.* ¶ 63.

[55]   *See id.* ¶ 65.

[56]   *See id.*

[57]   *See id.* ¶ 71.

14

litigated section 1983 cases.[58]  Before then, Tann was an associate at Morgan,

Lewis & Bockius LLP.[59]  Gregory Glickman, an associate at Lewis Brisbois,

graduated from Georgetown University School of Law in 2005.[60]  Before joining

Lewis Brisbois, Glickman was an associate for three years at Collazo Carling &

Mish LLP where, for the most part, he represented defendants.[61]  Suzanne

Aribakan graduated from New York Law School in 2005 and joined Lewis

Brisbois as an associate in December 2006.[62]

### 2.    OGC

The OGC serves as counsel for DC 37, a union with approximately

125,000 members in fifty-six local unions.[63]  During Polletta's tenure at the OGC,

the OGC consisted of approximately eleven attorneys, the majority of whom had

over fifteen years experience litigating labor and employment matters.[64]   With the

---

[58]    *See id.*

[59]    *See id.*

[60]    *See id.* ¶ 74.

[61]    *See id.* ¶¶ 74-75.

[62]    *See id.* ¶ 76.

[63]    *See* Declaration of Leonard D. Polletta in Support of Plaintiffs'
Application for Attorneys' Fees ("Polletta Decl."), Ex. A to the Smith Decl., ¶ 25.

[64]    *See id.*

exception of a seven-month period in 1992, Polletta was employed by the OGC in the title of assistant general counsel from August 1985 to July 2007.[65]  Before joining the OGC, Polletta worked as an associate counsel for the United Electrical, Radio and Machine Workers of America from November 1977 through August 1985.  In that capacity, he represented the national union, its affiliated local unions and their members before the National Labor Relations Board.[66]

## III.  STANDARD FOR FEE AWARDS

It is a well-established rule that "'any attorney . . . who applies for court-ordered compensation in this Circuit . . . must document the application with contemporaneous time records . . . specify[ing], for each attorney, the date, the hours expended, and the nature of the work done.'"[67] "If the court finds that the fee applicant's claim is excessive or insufficiently documented, or that time spent was wasteful or redundant, the court may decrease the award, either by eliminating compensation for unreasonable hours or by making across-the-board percentage

---

[65]     *See id.* ¶ 4 (Polletta worked at the OGC from August 1985 to April 1992 and December 1992 to July 2007).

[66]     *See id.* ¶ 27.

[67]     *Yea Kim v. 167 Nail Plaza, Inc.*, No. 05 Civ. 8560, 2009 WL 77876, at *4 (S.D.N.Y. Jan. 12, 2009) (quoting *New York State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1148 (2d Cir. 1983)) (alteration in original).

16

cuts in the total hours for which reimbursement is sought."[68]  There is, however,

no rule requiring proportionality between the amount of fees requested and the

damages recovered.[69]

District courts are afforded considerable discretion in determining the

amount of attorneys' fees in any given case.[70]  However, the Second Circuit has

recently abandoned the lodestar approach, previously used by district courts in

calculating attorneys' fees, in favor of a "presumptively reasonable fee"

---

[68]     *Wise v. Kelly*, 620 F. Supp. 2d 435, 442 (S.D.N.Y. 2008).  *Accord Kirsch v. Fleet Street, Ltd.*, 148 F.3d 149, 173 (2d Cir. 1998) ("[I]n dealing with . . . surplusage, the court has discretion simply to deduct a reasonable percentage of the number of hours claimed 'as a practical means of trimming fat from a fee application[.]'") (quoting *New York State Ass'n for Retarded Children*, 711 F.2d at 1146).

[69]     *See Kassim v. City of Schenectady*, 415 F.3d 246, 252 (2d Cir. 2005) ("Reasoning that a rule calling for proportionality between the fee and the monetary amount involved in the litigation would effectively prevent plaintiffs from obtaining counsel in cases where deprivation of a constitutional right caused injury of low monetary value, we have repeatedly rejected the notion that a fee may be reduced merely because the fee would be disproportionate to the financial interest at stake in the litigation.") (citing *Quarantino v. Tiffany & Co.*, 166 F.3d 422 (2d Cir. 1999), in "rejecting a 'billing judgment' rule that would limit the awardable fee to one rationally related to the recovery that could be expected *ex ante*.").

[70]     *See Barfield v. New York City Health and Hosps. Corp.*, 537 F.3d 132, 151 (2d Cir. 2008).

17

approach.[71]

> The meaning of the term "lodestar" has shifted over time,
> and its value as a metaphor has deteriorated to the point of
> unhelpfulness. This opinion abandons its use. We think
> the better course – and the one most consistent with
> attorney's fees jurisprudence – is for the district court, in
> exercising its considerable discretion, to bear in mind *all* of
> the case-specific variables that we and other courts have
> identified as relevant to the reasonableness of attorney's
> fees in setting a reasonable hourly rate. The reasonable
> hourly rate is the rate a paying client would be willing to
> pay. In determining what rate a paying client would be
> willing to pay, the district court should consider, among
> others, the *Johnson* factors; it should also bear in mind that
> a reasonable, paying client wishes to spend the minimum
> necessary to litigate the case effectively. The district court
> should also consider that such an individual might be able
> to negotiate with his or her attorneys, using their desire to
> obtain the reputational benefits that might accrue from
> being associated with the case. The district court should
> then use that reasonable hourly rate to calculate what can
> properly be termed the "presumptively reasonable fee."[72]

---

[71]   *Simmons v. New York City Transit Auth.*, No. 08-4079-cv(L), 2009
WL 2357703, at *1 (2d Cir. Aug. 3, 2009).

[72]   *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of
Albany*, 522 F.3d 182, 190 (2d Cir. 2008) (footnote omitted, second italics added).
The twelve *Johnson* factors referred to above include: "(1) the time and labor
required; (2) the novelty and difficulty of the questions; (3) the level of skill
required to perform the legal service properly; (4) the preclusion of employment
by the attorney due to acceptance of the case; (5) the attorney's customary hourly
rate; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by
the client or the circumstances; (8) the amount involved in the case and the results
obtained; (9) the experience, reputation, and ability of the attorneys; (10) the
'undesirability' of the case; (11) the nature and length of the professional

Thus, in determining a reasonable hourly rate for a particular fee request,

> the district court should, in determining what a reasonable,
> paying client would be willing to pay, consider factors
> including, but not limited to, the complexity and difficulty
> of the case, the available expertise and capacity of the
> client's other counsel (if any), the resources required to
> prosecute the case effectively (taking account of the
> resources being marshaled on the other side but not
> endorsing scorched earth tactics), the timing demands of
> the case, whether an attorney might have an interest
> (independent of that of his client) in achieving the ends of
> the litigation or might initiate the representation himself,
> whether an attorney might have initially acted *pro bono*
> (such that a client might be aware that the attorney
> expected low or non-existent remuneration), and other
> returns (such as reputation, etc.) that an attorney might
> expect from the representation.[73]

The two competing methods, the lodestar method and the *Johnson*

method, are in tension with each other. As explained by the Second Circuit:

> A district court using the lodestar method would set the
> lodestar and then consider whether, in light of variables
> such as the difficulty of the case, it should adjust the
> lodestar before settling on the reasonable fee it was
> ultimately inclined to award. . . . By contrast, a district
> court employing the *Johnson* method would consider
> factors, such as the difficulty of the case, earlier in the

---

relationship with the client; and (12) awards in similar cases." *Id.* at 186 n.3
(citing *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir.
1974), *abrogated on other grounds by Blanchard v. Bergeron*, 489 U.S. 87, 92-93
(1989)).

[73]     *Id.* at 184.

> fee-calculation process by weighing them in setting its
> tentative reasonable fee, from which there would seldom be
> a need to depart.[74]

The Second Circuit has acknowledged that "[t]he Supreme Court adopted the

lodestar method in principle without, however, fully abandoning the *Johnson*

method."[75]  What this means in practice is unclear, however.[76]  The Second Circuit

---

[74]      *Id.* at 187 (citations omitted).  The Second Circuit's proclamation of
the "presumptively reasonable fee" as the current approach in calculating
attorneys' fees may, in fact, have little practical significance.  "Although the term
'lodestar' is now disfavored by the Second Circuit, the applicable approach still
contemplates (1) a consideration of the number of hours actually spent by counsel
and other personnel that are deemed reasonably necessary to a successful outcome
for the client, and (2) the setting of reasonable hourly rates for counsel, a criterion
most recently, if opaquely, described by the Second Circuit as the 'rate a paying
client would be willing to pay.'"  *Metrokane v. Built NY, Inc.*, No. 06 Civ. 14447,
2009 WL 637111, at \*1 (S.D.N.Y. Mar. 6, 2009) (quoting *Arbor Hill*, 522 F.3d at
190).

[75]      *Arbor Hill*, 522 F.3d  at 188 (citing *Hensley v. Eckerhart*, 461 U.S.
424, 433 (1983) and *Blum v. Stenson*, 465 U.S. 886 (1984)).  According to the
Second Circuit, "[t]he Supreme Court collapsed what had once been a two-step
inquiry into a single-step inquiry; it shifted district courts' focus from the
reasonableness of the lodestar to the reasonableness of the hourly rate used in
calculating the lodestar, which in turn became the *de facto* reasonable fee."  *Id.*

[76]      *See id.* at 188-89 (stating that in cases decided after *Hensley* and
*Blum*, the Supreme Court has suggested that district courts use the *Johnson* factors
to adjust the lodestar).  *See also Blanchard*, 489 U.S. at 94 ("And we have said
repeatedly that '[t]he initial estimate of a reasonable attorney's fee is properly
calculated by multiplying the number of hours reasonably expended on the
litigation times a reasonable hourly rate.'  The courts may then adjust this lodestar
calculation by other factors. . . .  The *Johnson* factors may be relevant in adjusting
the lodestar amount, but no one factor is a substitute for multiplying reasonable

20

has concluded that "[t]he net result of the fee-setting jurisprudence here and in the Supreme Court is that the district courts must engage in an equitable inquiry of varying methodology while making a pretense of mathematical precision.[77]

Not addressed in either *Arbor Hill* or *Simmons* is whether and how a fee request should be reduced because of plaintiffs' limited success. This question was addressed in *Barfield*, a case which post-dated *Arbor Hill*.[78] In *Barfield*, the district court declined to certify plaintiff's suit as an FLSA collective action.[79] As a result, the district court then reduced plaintiff's fee request, based on the lodestar calculation, by fifty percent.[80] On appeal, the Second Circuit affirmed the district court's reduction.[81] In so doing, the court stated that it was

---

billing rates by a reasonable estimation of the number of hours expended on the litigation.") (quoting *Blum*, 465 U.S. at 888) (alteration in original).

[77]     *Arbor Hill*, 522 F.3d at 189.

[78]     *Barfield* was decided on August 8, 2008. *Arbor Hill* was last amended on April 10, 2008.

[79]     *See Barfield*, 537 F.3d at 137.

[80]     *See id.* at 151. "The district court in this case, operating without the benefit of the *Arbor Hill* decision, did not employ its specific technique for determining a presumptively reasonable fee, but that is not a concern on this appeal where plaintiff does not challenge the lodestar calculation but only the 50 percent reduction applied to it." *Id.* at 152.

[81]     *See id.* at 153 ("The district court did not abuse its discretion in reducing attorney's fees to reflect plaintiff's failure to secure collective action

> mindful of the Supreme Court's observation that "the most
> critical factor" in a district court's determination of what
> constitutes reasonable attorney's fees in a given case "is
> the degree of success obtained" by the plaintiff.[82]

The *Barfield* court concluded that the "degree of success" inquiry "is not limited

to inquiring whether a plaintiff prevailed on individual claims."[83]  "Both the

quantity and quality of relief obtained, as compared to what the plaintiff sought to

achieve as evidenced in her complaint, are key factors in determining the degree of

success achieved."[84]  The court noted that "'[i]f a plaintiff has achieved only

partial or limited success, the product of hours reasonably expended on the

litigation as a whole times a reasonable hourly rate may be an excessive amount . .

. even where the plaintiff's claims were interrelated, non-frivolous, and raised in

good faith.'"[85]

        In *Kassim*, the Second Circuit analyzed the "degree of success" factor

in even greater detail.  The *Kassim* court noted that "[t]he Supreme Court has

---

certification.").

   [82]    *Id.* at 152 (quoting *Farrar v. Hobby*, 506 U.S. 103, 114 (1992) and
citing *Kassim*, 415 F.3d at 254).

   [83]    *Id.* (citing *Kassim*, 415 F.3d at 254).

   [84]    *Id.* (quotation marks and citation omitted).

   [85]    *Id.* (quoting *Hensley*, 461 U.S. at 436).

consistently stressed the importance of the degree of the plaintiff's success in the

litigation as a factor affecting the size of the fee to be awarded."[86]  The court then

addressed the distinction, or lack thereof, between unitary cases and cases

involving a number of distinct claims.

> Reviewing the large variety of factors relevant to an award
> of attorney's fees, the [Supreme] Court concluded that "the
> most critical factor is the degree of success obtained."  The
> Court elaborated on this observation, both in the context of
> a suit involving a number of "distinctly different claims for
> relief that are based on different facts and legal theories,"
> and cases which "present only a single claim" or which
> "involve a common core of facts or will be based on related
> legal theories[.]"    In either type of case, the Court
> explained, the "degree of success obtained" is "the most
> critical factor."[87]

The *Kassim* court reached the following conclusion: "Our circuit has thus clearly

adopted the view . . . that a district judge's authority to reduce the fee awarded to a

prevailing plaintiff below the lodestar by reason of the plaintiff's 'partial or

limited success' is not restricted either to cases of multiple discrete theories or to

cases in which the plaintiff won only a nominal or technical victory."[88]

---

[86]     *Kassim*, 415 F.3d at 253.

[87]     *Id.* (quoting *Hensley*, 461 U.S. at 436, 434, 435 and 436,
respectively).

[88]     *Id.* at 256.

In sum, given the current attorneys' fees jurisprudence established by the Supreme Court and the Second Circuit, the *Johnson* factors are to be used in setting reasonable hourly rates but the resulting "presumptively reasonable fee" is subject to further reduction due to, *inter alia*, plaintiffs' limited success.[89] Accordingly, the next step is to review the contemporaneous time records submitted by counsel in light of the *Johnson* factors and for overall reasonableness.

## IV.   DISCUSSION

### A.   Hourly Rates

Plaintiffs seek the following hourly rates for the Lewis Brisbois attorneys: Ivan Smith - $600; Maureen Stampp - $550; Sabrina Tann - $300; Gregory Glickman - $ 275; and Suzanne Aribakan - $275.[90]  Plaintiffs also seek a rate of $125 per hour for the paralegals at Lewis Brisbois.[91]  Finally, plaintiffs seek $550 per hour for the services of Leonard D. Polletta.[92]

---

[89]    "The Second Circuit has observed that district courts retain the authority to reduce a statutory fee award by reason of the plaintiff's 'partial or limited success.'" *Estrella v. P.R. Painting Corp.*, 596 F. Supp. 2d 723, 727 (E.D.N.Y. 2009) (quoting *Kassim*, 415 F.3d at 256).

[90]    *See* Smith Decl. ¶ 83.

[91]    *See id.*

[92]    *See id.*

In *Scott v. City of New York*, this Court approved of a rate of $425 per hour for a senior partner who had substantial experience in the FLSA field.[93] While the parties argue vigorously over the qualifications of the attorneys at Lewis Brisbois, it is apparent that the Lewis Brisbois partners, Smith and Stampp, have substantial experience litigating employment matters. It is also apparent that Smith and Stampp do not have substantial experience litigating FLSA cases in particular. In weighing these countervailing factors, I see no reason to depart from the rates set for partners in the *Scott* case – namely $425 per hour. This $425 per hour rate also seems appropriate for the work done by Polletta while at the OGC. I further find the following rates to be appropriate for the associates at Lewis Brisbois:  Tann - $300 per hour (no adjustment); Glickman - $250 per hour ($25 per hour adjustment); Aribakan - $200 per hour ($75 per hour adjustment).

---

[93]     *See Scott v. City of New York*, No. 02 Civ. 9530, 2009 WL 2610747, at *4 n.35 (S.D.N.Y. Aug. 25, 2009) ("In consideration of the extensive wage-and-hour experience of plaintiffs' counsel Aitchison, defendants do not contest his claimed hourly rates of $350 to $425 over the course of this litigation.") (citing *Arnone v. CA, Inc.*, No. 08 Civ. 4458, 2009 WL 585841, at *3 (S.D.N.Y. Mar. 6, 2009) (stating that $425 per hour is a typical rate for labor lawyers with substantial experience with the Employee Retirement Income Security Act ("ERISA")). *Accord Sheehan v. Metropolitan Life*, 450 F. Supp. 2d 321, 328 (S.D.N.Y. 2006) (approving $425 per hour for an "experienced and effective" ERISA attorney)).

Finally, because much of the time spent by the paralegals was spent inputting time cards into an electronic database, their collective rate is reduced to $75 per hour, which represents a $50 per hour adjustment.[94]  Using these adjusted rates, the revised attorneys' fees amount to $1,691,545.50 for Lewis Brisbois and $38,836.50 for the OGC of DC 37.[95]

### B.    Adjustments to the Presumptively Reasonable Fee

#### 1.    Excessive and  Redundant Fees and Vague Entries

With regard to Lewis Brisbois, plaintiffs seek compensation for 4,406.67 hours in attorney time and 1,506.15 hours in paralegal time, for a total of 5,912.82 hours.[96]  The total hours sought on behalf of the OGC, 91.38, pales in comparison.[97]  The attorney time alone for LBB&S represents more than 110

---

[94]    *See In re Zyprexa Prods. Liab. Litig.*,  No. 04-MD-1596, 2008 WL 1844000, at *9 (E.D.N.Y. Apr. 22, 2008) (finding data entry to be "more akin to clerical or even secretarial tasks" and reducing rate for such work to $50 per hour).

[95]    The fee award relating to the OGC is not subject to further reduction because of the limited of number of hours charged by counsel.

[96]    The original number of hours for LBB&S was 6,752.70.  However, to adjust for hours spent on severable claims on which plaintiffs did not prevail, plaintiffs reduced the total number of hours for LBB&S by 839.88 hours. *See* Smith Decl. ¶ 81.

[97]    This Court sees no need to adjust the number of hours sought on behalf of the OGC which represented plaintiffs for approximately eleven and one-half months, from July 18, 2006 through June 29, 2007.

forty-hour work weeks.  When paralegal time is included, the number of forty-

hour work weeks rises to almost 148.  Yet LBB&S was retained in September of

2007 and the case effectively settled in April 2009, which represents

approximately a seventeen-month period.  Even with substantial discovery,

followed by motion practice, the number of hours charged by LBB&S remains

unusually high.  Indeed, I have never seen a  law firm charge almost six thousand

hours for a relatively straightforward FLSA case that settled before trial.

Furthermore, although LBB&S states that it used junior attorneys whenever

possible to reduce fees,[98] the facts are to the contrary.  Total partner time charged

by LBB&S amounts to 2,693.97 hours compared to total junior associate time of

1,712.70 hours.[99]  Typically, it is the other way around, with junior associates

charging significantly more time than partners.   Defendants should not have to

bear the burden of Lewis Brisbois' failure to delegate tasks in a cost-effective

manner.

   Furthermore, defendants point to a number of time entries

demonstrating that LBB&S charged an excessive and/or redundant number of

hours for particular tasks.  Some of the time entries are simply too vague to

---

[98]  *See* Smith Decl. ¶ 82.

[99]  *See id.* ¶ 84.

accurately determine what was in fact done.[100]  The combination of these entries

indicate that unreasonable amounts of time were charged for certain tasks, that

often more than one person charged time for the same task, and that many entries

are indecipherable.   This trio of errors shakes my confidence in the reliability of

the time records submitted by LBB&S in support of plaintiffs' fee application.

Given these deficiencies, I will apply a twenty-percent (20%) across-the-board

reduction to the attorneys' fees charged by LBB&S.[101]  Accordingly, plaintiffs will

be awarded eighty percent (80%) of the adjusted fees of LBB&S, which amounts

to $1,353,236.40, and one-hundred percent (100%) of the adjusted fees of the

OGC, which amounts to $38,836.50.

###         2.        Limited Success

Plaintiffs have reduced their LBB&S fee request by 13.2% , from

$2,558,840.00 to $2,221,065.00, based on plaintiffs' limited success.  Given my

reduction for excessive and redundant fees and vague time entries, I will not

further reduce the amount of fees because  of plaintiffs' limited success.

---

[100]      *See* Def. Mem. at 12-19. *See also* November 24, 2009 Letter from
Assistant Corporation Counsel Diana Voight.,

[101]      *See* n.68, *supra*.

28

## C.   Adjustments to Costs

Plaintiffs seek $25,311.76 for costs incurred by LBB&S. Plaintiffs also seek $112,269.72 for costs incurred by the OGC, the majority of which represent expert fees ($107,498.47). Defendants argue that plaintiffs should not be reimbursed for approximately $44,000 in expert fees relating to work done by "analysts" whose qualifications and credentials have never been provided. However, defendants never objected to Dr. Lanier, plaintiffs' expert. While Dr. Lanier delegated some work to others in preparing his damages calculation, he adopted the work as his own. This delegation, in all likelihood, reduced Dr. Lanier's overall fees. I will, however, make two adjustments to the costs incurred by LBB&S. *First*, the charge for "Photocopying/Duplication" of $0.25 per page is excessive. This charge is reduced to $0.10 per page, resulting in a total of $6,284.60. *Second*, I decline to reimburse the $893.39 charge for "OnLine Search." Defendants should not be required to bear the costs of locating plaintiffs who changed addresses without notice. Accordingly, plaintiffs are awarded $112,269.72 in costs incurred by the OGC and $14,991.47 in costs incurred by LBB&S.

## V.     CONCLUSION

For the foregoing reasons, plaintiffs will be awarded the following amounts:  attorneys' fees of $1,353,236.40 and $14,991.47 in costs incurred by Lewis Brisbois plus attorneys' fees of $38,836.50 and $112,269.72 in costs incurred by the OGC, for a total award of $1,519,334.00.  The Clerk of the Court is directed to close plaintiffs' Motion for Attorneys' Fees and Costs (Document  # 268).

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            December 9, 2009

## - Appearances -

**For Plaintiffs:**

Ivan D. Smith , Esq.
Maureen M. Stampp, Esq.
Lewis Brisbois Bisgaard & Smith LLP
199 Water Street, 25th Floor
New York, NY 10038
(212) 232-1300

Thomas Cook
Assistant General Counsel
District Council 37, AFSCME, AFL-CIO
125 Barclay Street
New York, NY 10007
(212) 815-1450

**For Defendants:**

Diana G. Voigt
Assistant Corporation Counsel
New York City Law Department
100 Church Street
New York, NY 10007
(212) 788-0894